**UNITED STATES of America ex rel. Ronald E. LONG, Plaintiff/Relator,**

v.

**SCS BUSINESS & TECHNICAL INSTITUTE, et al., Defendants.**

**No. CIV. A. 92–2092 (EGS).**

United States District Court, District of Columbia.

March 26, 1998.

Stuart F. Pierson, Levine Pierson Sullivan & Koch, L.L.P., Washington, DC, for Ronald E. Long.

T. Reed Stephens, Michael F. Hertz, Civil Division, United States Department of Justice, Washington, DC, for U.S.

Melvin Paradise, Allen N. Taffet, Paradise & Alberts, L.L.P., New York, NY, for SCS Business & Technical Institute, Inc., Marguerite Alsultany, Casablanca Resorts Dev. of Anguilla, Ltd., Casablanca Resorts, Ltd., Intervest Intern. Holding Corp., Intervest Holding Corp.

N. Frank Wiggins, Venable, Baetjer, Howard & Civiletti, Washington, DC, Melvin Paradise, Allen N. Taffet, Paradise & Alberts, L.L.P., New York, NY, for Michael Alharmoosh.

N. Frank Wiggins, Venable, Baetjer, Howard & Civiletti, Washington, DC, for Sylvana Alharmoosh.

Julia R. Cohen, George Shebitz, George Shebitz & Associates, P.C., New York, NY, Melvin Paradise, Allen N. Taffet, Paradise & Alberts, L.L.P., New York, NY, for Kamal Asultany.

Howard Zwickel, Office of Attorney General, Albany, NY, Melvin Paradise, Allen N. Taffet, Paradise & Alberts, L.L.P., New York, NY, for State of New York.

Jill A. Dunn, Dreyer Boyajian, LLP, Albany, NY, for Joseph P. Frey.

## MEMORANDUM OPINION & ORDER

SULLIVAN, District Judge.

Ronald E. Long ("Long" or "relator") brought this action as a relator on behalf of the United States alleging violations of the False Claims Act ("FCA" or "the Act"), 31 U.S.C. §§ 3729–3733, and on his own behalf

pursuant to 42 U.S.C. § 1983. Long named as defendants SCS Business & Technical Institute, Inc. ("SCS"), Mohammed (a.k.a. Michael) Alharmoosh, President of SCS, Kamal Alsultany, principal owner and Chairman of the Board of SCS, the State of New York ("New York"), and Joseph P. Frey ("Frey"). Pursuant to the *qui tam* provisions of the FCA, the complaint was immediately put under seal. *See* 31 U.S.C. § 3730(b)(2). The government intervened in July 1995, and the Department of Justice filed a first amended complaint against SCS, Michael Alharmoosh, and Kamal Alsultany in September 1995.[1] The government declined, however, to intervene against New York and Frey. Long then filed his second amended complaint in June 1996.

Pending before the Court are defendant New York's and defendant Joseph P. Frey's motions to dismiss relator Long's second amended complaint for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted, or, in the alternative, to dismiss Counts I and II for failure to plead fraud with particularity.

## I. FACTUAL ALLEGATIONS

Long, relator and plaintiff in this action, served as Coordinator of Investigations and Audit for the Bureau of Proprietary School Supervision ("BPSS") of the New York State Department of Education ("NYSED") from August 21, 1989 to April 8, 1992. BPSS is the state agency that regulates proprietary schools in New York. Frey was Long's supervisor at BPSS. SCS managed five proprietary schools in New York: two in Brooklyn, and one each in the Bronx, Queens, and Manhattan.

Long's second amended complaint contains three counts against New York and Frey. Count I alleges that New York, Frey, and SCS formed a conspiracy to have false claims paid by the United States in violation of 31 U.S.C. § 3729(a)(3). Count II alleges that New York and Frey caused false claims and reports to be presented to the United States for payment in violation of 31 U.S.C. § 3729(a)(1) and (2). Count II also alleges that New York and Frey were unjustly enriched as a result of the payments they received from SCS. Count III alleges that New York and Frey harassed and wrongfully discharged Long in violation of 31 U.S.C. § 3730(h) and 42 U.S.C. § 1983.

As Coordinator of Investigations for BPSS, Long directed an investigation of SCS beginning in September 1989. SCS allegedly received federal funding under a variety of federal programs for student financial assistance.[2] Long has alleged that the investigation he coordinated uncovered a variety of fraudulent policies and acts by SCS that resulted in SCS receiving federal moneys. This fraud included allegedly falsifying enrollment-eligibility scores, training low-level SCS staff how to falsify records, assigning students to courses for which they were ineligible and in which they were incapable of participating, and refusing to make required refunds to students. BPSS responded to Long's investigation by instituting administrative proceedings against SCS. In February 1992, BPSS issued an "Order to Show Cause" and a "Bill of Particulars" alleging that SCS had engaged in a number of violations of New York law. BPSS and SCS reached a settlement in March 1992.

Long alleges, however, that this was a "sweetheart" settlement because the violations upon which it was based were confined to actions of low-level personnel and to a small number of violations at one school, even though, according to Long, New York officials, including Frey, knew that the fraud was occurring at more than one school and that it included actions by SCS management. Long further alleges that as a result of this settlement, New York falsely represented to

---

1. Together with Mr. Alsultany, the government also named as defendants Ms. Marguerite Alsultany, Casablanca Resorts Development of Anguilla, Ltd., Casablanca Resorts, Ltd., Intervest International Holding Corporation, and Intervest Holding Corporation (collectively, the "Alsultany and Caribbean Defendants"). In April 1996, the government filed a second amended complaint

and, at that time, Ms. Sylvana Alharmoosh was added as a defendant.

2. These programs include Pell Grants, Supplemental Educational Opportunity Grants, PLUS/SLS loans, and federally-guaranteed Stafford Loans.

the federal government that SCS was no longer engaging in fraud, and that New York was monitoring SCS.

Central to Long's claim is that BPSS allegedly received a share of the federal funding that SCS fraudulently obtained. BPSS allegedly received this share through tuition assessments and fines that SCS paid for violations of state law. Long alleges that BPSS's share of SCS's federal funding was so large that SCS was one of BPSS's major sources of funding. Further, Long alleges that as a result of BPSS's interest in SCS's continued operation, BPSS engaged in two illegal activities: it limited Long's investigation and it ignored evidence that SCS continued to present fraudulent claims.

First, Long alleges that BPSS placed limitations on Long's investigation of SCS resulting in the "sweetheart" settlement with SCS which allowed SCS to continue to fraudulently receive federal moneys. Long alleges that BPSS placed the following limitations on his investigation of SCS: reducing the number of incidents of alleged fraud he was authorized to investigate, rejecting evidence that SCS management and owners were involved in the fraud, limiting the number of schools he was authorized to investigate, and placing limitations on his documentation of evidence. Further, Long alleges that BPSS refused to investigate information Long had gathered indicating that SCS believed it was protected by its contacts in BPSS. Long also alleges that in October 1991, Frey specifically prohibited Long from investigating evidence of fraud by SCS management and owners.

After the 1992 settlement with SCS, Long alleges that BPSS ignored evidence that SCS continued to receive federal moneys on a fraudulent basis in order to allow SCS to continue receiving federal moneys. According to Long, New York officials, including Frey, falsely represented to the federal government that SCS was not engaged in fraud and that BPSS was continuing its investigation when in fact it was not. Moreover, Long alleges that New York officials, including Frey, indicated to the federal government in the 1992 settlement that there was no indication of widespread fraud nor of involvement by management, even though BPSS knew this was false.

Long asserts that he refused to follow his superiors' instructions regarding the investigation of SCS and that, as a result, in November 1991, Frey informed him that he would be demoted with a loss of pay effective April 8, 1992, if Long had not resigned by that date. Long further alleges that in December 1991, he contacted the FBI to inform them of the evidence of fraud that he had gathered, and that he felt BPSS's limitations on his investigation were a result of the agency's interest in continuing to receive a share of the federal moneys that SCS received. According to Long, the FBI then launched an investigation (the Court assumes of SCS) in which Long assisted the FBI by obtaining evidence from SCS. Long allegedly reported his cooperation with the FBI to Frey. On January 14, 1992, Frey removed Long from the investigation of SCS. Long alleges that Frey then ordered him to prepare a final report of the investigation consisting of reporting one type of violation at one school. Long alleges that he prepared this report under protest. On January 22, 1992, Long was placed on administrative leave.

Long finally alleges various acts by New York officials following his placement on administrative leave and eventual termination. The essence of Long's allegations are that New York colluded with SCS's continuing fraud, thereby allowing SCS and BPSS to continue to receive federal moneys based on false claims. Long alleges that New York officials, including Frey, ignored State Comptroller reports in April and December 1992 which indicated that there was continuing and broader fraud than had been stated in the 1992 "Order to Show Cause." Long alleges that in February 1993, BPSS investigators noticed indications of continuing fraud at SCS. Long alleges that New York officials, including Frey, refused to act on that information, and instead unreasonably ordered further investigation rather than taking steps to stop the fraud. Thus, Long alleges that, between at least March 1993 and April 1994, New York and Frey knew that SCS continued to engage in fraudulent activities, but did

not act upon that information. SCS declared bankruptcy in January 1995. Long alleges that between 1988 and 1991, the United States paid SCS over $25 million per year in response to SCS's false claims, with BPSS receiving a portion of these payments.

## II. DISCUSSION

A complaint may be dismissed for failure to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). The motion will be denied only if the plaintiff could prove no set of facts which would entitle him to relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In responding to a motion to dismiss, the Court treats all allegations of fact in the complaint to be true, and draws all reasonable inferences from those facts in favor of the plaintiff. *See id; EEOC v. St. Francis Xavier Parochial School,* 117 F.3d 621, 624 (D.C.Cir. 1997); *United States ex rel. Alexander v. Dyncorp, Inc.,* 924 F.Supp. 292, 296 (D.D.C.1996)(*citing United Parcel Serv., Inc. v. International Bhd. of Teamsters,* 859 F.Supp. 590, 593 (D.D.C.1994)).

Federal courts are courts of limited jurisdiction. The party who invokes federal court jurisdiction must "allege in [its] pleading the facts essential to show jurisdiction," and "must support [those facts] by competent proof." *McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936).

New York has moved to dismiss the second amended complaint on the grounds of lack of subject matter jurisdiction, failure to state a claim, and failure to plead fraud with particularity as to Counts I and II. Defendant Frey has moved to dismiss the second amended complaint on the grounds of plaintiff's failure to state a claim, or, in the alternative for summary judgment on the basis of Eleventh Amendment immunity and qualified immunity.

## A. Whether New York and its Officials Are Proper Defendants in an False Claims Act Suit

■ The first issue the Court considers in this case is New York's argument that it has Eleventh Amendment immunity from suit under the FCA. This Court rejects New York's argument that the Eleventh Amendment bars an FCA action against a state. The Eleventh Amendment is not a bar to an FCA action because the United States is always the plaintiff in a *qui tam* action and the Eleventh Amendment does not prohibit suits by the United States against States in federal court. *See Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 71 n. 14, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996)(citing *United States v. Texas,* 143 U.S. 621, 644–45, 12 S.Ct. 488, 36 L.Ed. 285 (1892)) (noting that state compliance with federal law is ensured by the fact that the federal government can sue a state in federal court for a violation of federal law); *United States v. Mississippi,* 380 U.S. 128, 140, 85 S.Ct. 808, 13 L.Ed.2d 717 (1965) ("[N]othing in [the Eleventh Amendment] or any other provision of the Constitution prevents or has ever been seriously supposed to prevent a State's being sued by the United States"). For this reason, states have often been defendants in *qui tam* suits under the FCA. *See United States ex rel. Berge v. Board of Trustees of the Univ. of Alabama,* 104 F.3d 1453 (4th Cir.) (state university defendant), *cert. denied,* —— U.S. ——, 118 S.Ct. 301, 139 L.Ed.2d 232 (1997); *United States ex rel. Milam v. University of Texas M.D. Anderson Cancer Center,* 961 F.2d 46 (4th Cir.1992) (state university defendant); *United States ex rel. Weinberger v. Florida,* 615 F.2d 1370 (5th Cir.1980) (state defendant); *Wilkins ex rel. United States v. Ohio,* 885 F.Supp. 1055 (S.D.Ohio 1995) (state defendant); *United States ex rel. Milam v. Regents of Univ. of California,* 912 F.Supp. 868 (D.Md.1995) (state university defendant); *United States ex rel. Moore v. University of Mich.,* 860 F.Supp. 400 (E.D.Mich.1994) (state defendant); *United States ex rel. Fine v. University of California,* 821 F.Supp. 1356 (N.D.Cal.1993) (state university defendant), *aff'd,* 72 F.3d 740 (9th Cir.1995); *United States ex rel. Navarette v. Rockwell Int'l Corp.,* 730 F.Supp. 1031, 1035 (D.Colo.1990) (laboratory, operated and managed by state university, was defendant).

In view of the foregoing persuasive authority, this Court holds that a *qui tam* action

may be brought against the State of New York because a *qui tam* suit is commenced on behalf of the United States and the Eleventh Amendment does not bar suits by the federal government against a state.

## B. Whether New York and Its Officials Are "Persons" Within the Meaning of the FCA

New York next argues that it is shielded from liability under the FCA because a state cannot be considered a "person" under that statute. The FCA provides, in pertinent part, that "any person" who causes false claims and reports to be presented to the United States for payment, or who forms a conspiracy to have false claims paid by the United States, will be liable for treble damages and civil penalties. *See* 31 U.S.C. § 3729. This section of the FCA, however, does not define the word "person."

■ The "fundamental task in interpreting the FCA is 'to give effect to the intent of Congress.'" *United States ex rel. D.J. Findley v. FPC–Boron Employees' Club,* 105 F.3d 675, 681 (D.C.Cir.) (citations omitted), *cert. denied,* — U.S. —, 118 S.Ct. 172, 139 L.Ed.2d 114 (1997). "The starting point for interpreting a statute is the language of the statute itself." *Id.* To determine the meaning of the statute, the Court considers the statute's language and structure, and its legislative history. *See California State Bd. of Optometry v. Federal Trade Comm'n,* 910 F.2d 976, 979 (D.C.Cir.1990). Although the word "person" is ordinarily construed to exclude a sovereign, this reading "may ... be disregarded if '[t]he purpose, the subject matter, the context, the legislative history, [or] the executive interpretation of the statute ... indicate an intent, by the use of the term, to bring a state or nation within the scope of the law.'" *International Primate Protection League v. Administrators of Tulane Educ. Fund,* 500 U.S. 72, 83, 111 S.Ct. 1700, 114 L.Ed.2d 134 (1991) (internal quotations omitted).

■ Although Congress did not define the word "person" in § 3729, it did define that term in § 3733 of the FCA.[3] That section defines a "person," specifically for the purposes of that section, to include a "state." 31 U.S.C. § 3733(*l*)(4). Moreover, courts have allowed states to act as relators and bring civil suits for violations of § 3729 on behalf of the United States where the *qui tam* provisions allow a "person" to bring a civil suit. *See* 31 U.S.C. § 3730(b); *United States ex rel. Woodard v. Country View Care Center, Inc.,* 797 F.2d 888 (10th Cir.1986) (State of Colorado as relator); *United States ex rel. Wisconsin v. Dean,* 729 F.2d 1100 (7th Cir. 1984) (State of Wisconsin as relator). In allowing states to act as relators, courts have thus interpreted "person" to include a state in the context of who may commence a *qui tam* action.

In the absence of express judicial authority as to whether a state may be a defendant in a *qui tam* action, however, it is necessary to consider the legislative history of the Act. The FCA was originally enacted during the Civil War to combat the rampant fraud being perpetrated on the government by defense contractors. *See* S.Rep. No. 99–345, at 8, 1986 U.S. Code Cong. & Admin. News 5266. The FCA has been amended three times, with major revisions in 1986. *See id.* The purpose of the 1986 amendments was to "make the statute a more useful tool against fraud" in the face of continuing fraud against the Government. *Id.* at 2. The Senate Report accompanying the 1986 amendments to the FCA sets out the broad reach of the statute. "In its present form ... [t]he False Claims Act reaches all parties who may submit false claims. The term 'person' is used in its broad sense to include partnerships, associations, and corporations ... as well as States and political subdivisions thereof." *See id.* at 8 (citations omitted).

On the other hand, New York argues that the Court should be guided by the general understanding that construing the word

---

**3.** Section 3733 of the FCA provides the federal government with a Civil Investigative Demand ("CID"). The CID enhances the federal government's investigatory powers to enable it to obtain documents or testimony relevant to a FCA inves-

tigation. 31 U.S.C. § 3733(a); S.Rep. No. 99–345, at 33, 1986 U.S. Code Cong. & Admin. News 5266. Thus, this section requires states to provide this information to the federal government. *See* 31 U.S.C. § 3733.

"person" to include states is generally disfavored. *See Will v. Michigan Dep't of State Police,* 491 U.S. 58, 64, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)(citing *Wilson v. Omaha Tribe,* 442 U.S. 653, 667, 99 S.Ct. 2529, 61 L.Ed.2d 153 (1979)). New York's reliance upon *Will* is, however, misplaced. First, 42 U.S.C. § 1983 is clearly distinguishable from the FCA because § 1983 establishes a cause of action for *individual* plaintiffs,[4] whereas the FCA establishes civil liabilities for frauds at the expense of the United States.[5] *See* 31 U.S.C. § 3729. In an FCA action, therefore, the suit is always on behalf of the federal government. *See* 31 U.S.C. §§ 3729, 3730(b). Since § 1983 creates a private cause of action, the analysis in *Will* necessarily included Eleventh Amendment considerations. *See Will,* 491 U.S. at 66–67. The reasoning underlying the *Will* Court's reluctance to construe "persons" to include States for the purposes of § 1983 was "that if Congress intend[ed] to alter the 'usual constitutional balance between the States and the Federal Government,' it must make its intention to do so 'unmistakably clear in the language of the statute.'" *Will,* 491 U.S. at 65 (quoting *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 242, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985)). Because states are not immune from suits by the federal government, however, Congress was not required to state in the FCA that it intended to abrogate the states' sovereign immunity, as Congress would have been required to do if it intended to·subject states to private suits by individuals.

After reviewing the language and purpose of the statute, this Court finds no indication that Congress sought to create an exception for state actors to perpetrate fraud upon the federal government, especially since states are not immune to suits by the federal government in federal court. *See United States v. Rockwell Int'l Corp.,* 730 F.Supp. 1031, 1035 (D.Colo.1990) (holding that state defendants are not entitled to Eleventh Amendment immunity from suits brought pursuant to the FCA and noting that to "hold otherwise would render meaningless the FCA's provision authorizing *qui tam* actions against state agencies and officials operating under government contracts"). Consistent with the intent and purpose of the FCA, the Court therefore concludes that states are "persons" for the purposes of § 3729 and that Congress did not intend to exempt states from the FCA.

## C. Whether the FCA's Damages Provisions Are Punitive and Therefore Inapplicable to a State

■ As a final point, New York argues that the damages provision of the FCA suggests that the statute has a punitive purpose, and consequently, that the FCA cannot apply to the states because states enjoy a common law immunity to punitive damages which can only be overcome by a clear congressional statement of abrogation.

The purpose of the FCA is to enable the federal government to recover losses it sustains as a result of fraud. *See* S.Rep. No. 99–345, at 2–8, 1986 U.S. Code Cong. & Admin. News 5266. In interpreting the pre-

---

4. *See id.* at 64, 1986 U.S. Code Cong. & Admin. News 5266. The full text of 42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

5. New York urges, however, that in *Will,* the Supreme Court announced the "rule" that States are never "persons" in federal statutes regardless of whether the suit brought pursuant to the statute would be brought by an individual plaintiff or

by the United States, relying upon a case from this circuit. *California State Bd. of Optometry v. Federal Trade Comm'n,* 910 F.2d 976 (D.C.Cir. 1990). In *California State Board,* the question facing the D.C. Circuit was whether a state, acting in its sovereign capacity, is subject to regulation by the FTC under the Magnuson–Moss Amendments to the Federal Trade Commission Act, which granted the FTC rulemake authority to define specific acts or practices as unfair. *Id.* at 978–79. In addition to New York's overbroad reading of the holding in *Will,* its reliance on *California State Board,* a case construing an agency's power, in that case, the FTC, to regulate states under a statute enacted by Congress, pursuant to its Commerce Clause power, is misplaced.

1986 version of the FCA, which provided for double damages and penalties, the Supreme Court held that the FCA was a remedial, rather than punitive statute. *See United States v. Halper,* 490 U.S. 435, 446, 449, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989) (the FCA's damages provision represents "rough remedial justice" as long as rational relation exists between the government's loss and the damages imposed); *United States v. Bornstein,* 423 U.S. 303, 314–315, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976) (FCA's damages provision are remedial except under extreme circumstances); *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 551–52, 63 S.Ct. 379, 87 L.Ed. 443 (1943) (purpose of the FCA is to make the government whole for its losses and therefore statute not punitive). The Court further reasoned that the federal government is entitled to "rough remedial justice" and declined to impose a more exact method of accounting on the Congress. *United States v. Bornstein,* 423 U.S. at 314–315.

With regard to the treble damages provision of the amended FCA, the Eighth Circuit has held that the amended provision does not transform the statute from a remedial to a punitive one. In *United States v. Brekke,* 97 F.3d 1043 (8th Cir.1996), the court held that the FCA's treble damages were compensatory rather than punitive. *Id.* at 1047. The court based its decision upon the Supreme Court's reasoning in *Halper* that the " 'Government is entitled to rough remedial justice, that is, it may demand compensation according to a somewhat imprecise formula.' " *Brekke,* 97 F.3d at 1047 (quoting *Halper,* 490 U.S. at 446). This Court agrees with the reasoning in *Brekke* and concludes that the federal government's recovery of treble damages gives it "rough remedial justice" and therefore that the FCA is a remedial statute.

Furthermore, there is no indication that Congress intended to change the purpose of the statute from a remedial to a punitive one when it enacted the 1986 Amendments. *See*

S.Rep. No. 99–345, at 7, 1986 U.S. Code Cong. & Admin. News 5266 (noting that the Committee clarified that knowing standard did not require actual knowledge of fraud or specific intent to commit the fraud in order to make it more appropriate for *remedial* actions) (emphasis added).

Rather, the damages provision was amended for other reasons. First, Congress saw the need to modernize the provision, which had not been changed since the FCA was originally enacted 123 years ago. *See id.* at 2. Second, the provision was changed to make it consistent with the false claims provision in the 1986 Department of Defense Appropriations Act. *See id.* at 17. Third, the increased damages provision gives effect to the overall purpose of the 1986 amendments to make the FCA more effective and to encourage *qui tam* actions. *See id.* at 2. Although the amended FCA does not provide for a significant increase in the percentage of the recovery to a *qui tam* relator,[6] by virtue of the increased damages, the relator stands to receive a larger recovery. This increased recovery therefore serves the purpose of encouraging *qui tam* actions.

The Court therefore concludes that the FCA's penalties are not punitive, but rather remedial, as long as a rational relation exists between the government's loss and the damages assessed.

Given the Court's conclusions that· New York may be sued under the FCA, that New York may be considered a "person" within the context of the FCA, and that the damages provisions of the FCA are not punitive, the Court goes on to consider the subject matter jurisdiction provisions of the FCA.

**D. Whether this Court Has Subject Matter Jurisdiction Under the FCA**

Long brings his action under the FCA against New York and against his supervisor, Joseph P. Frey. New York, in its motion to dismiss, argues that the FCA precludes this

---

6. Under the former FCA, when the government intervened, the relator would receive 10% of the recovery; and when the government did not intervene, the relator would receive 25% of the recovery. *See* S.Rep. No. 99–345, at 27, 1986 U.S. Code Cong. & Admin. News 5266. Under

present law, when the government intervenes, the relator receives between 10% and 20% of the recovery; and when the government does not intervene, the relator receives between 20% and 30% of the recovery. 31 U.S.C. § 3730(d)(1), (2).

Court from asserting subject matter jurisdiction over this action. The Court must look to the language of the statute itself to assess the merits of defendant's contention. *Consumer Product Safety Comm'n v. GTE Sylvania Inc.*, 447 U.S. 102, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980). ·

The FCA sets out a two-part test to determine whether a court has subject matter jurisdiction over plaintiff's *qui tam* action and prohibits

> private plaintiff suits based upon the *public disclosure* of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, *unless* the action is brought by the Attorney General or the person bringing the action is an *original source* of the information.

31 U.S.C. § 3730(e)(4)(A) (emphasis added). The statute defines an "original source" as

> an individual who has *direct and independent knowledge* of the information on which the allegations are based and has *voluntarily provided* the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. § 3730(e)(4)(B) (emphasis added).

Thus, the Court must first determine if the allegations raised in this suit were publicly disclosed under the meaning of the statute. If the allegations were publicly disclosed, the Court may only assert subject matter jurisdiction over this *qui tam* action if plaintiff was an original source of the information.

### 1. Public Disclosure Inquiry

▮ Although both Long and New York agree that the allegations of fraud against SCS were publicly disclosed under the FCA as part of New York's 1992 administrative proceedings against SCS, the parties disagree as to whether New York's alleged fraud was publicly disclosed.

New York argues that because the allegations against SCS and New York are inextricably linked, Long can not "parse out" each claim and treat the allegations separately for purposes of determining whether public disclosure has occurred. In support of its position, New York cites a Tenth Circuit case which held that when a *"qui tam* action is based in any part upon publicly disclosed allegations or transactions," the court must then proceed to the "original source" inquiry. *See United States ex rel. Precision Co. v. Koch Industries,* 971 F.2d 548 (10th Cir. 1992).

Long first asserts that even though the allegations against SCS were publicly disclosed, the allegations against New York and Frey were not publicly disclosed, and therefore Long is not jurisdictionally barred from raising this claim. *See United States ex rel. Springfield Terminal Ry. Co. v. Quinn,* 14 F.3d 645, 657 (D.C.Cir.1994) (holding public disclosure under § 3730(e)(4)(A) occurs "only when specific allegations of fraud or the vital ingredients to a fraudulent transaction exist in the public eye") Here, only two of the many components of the alleged conspiracy by New York were publicly disclosed: that the SCS had acted fraudulently and that New York had settled with SCS. These two details, however, do not constitute the "vital ingredients" of the allegations against New York. Further, this circuit stated that "Congress sought to limit *qui tam* actions 'to those in which the relator has contributed significant independent information [that is not already in the public domain].'" *United States ex rel. D.J. Findley v. FPC Boron Employees' Club,* 105 F.3d 675, 682 (D.C.Cir. 1977) (citing *Quinn,* 14 F.3d at 653). In his claim, Long demonstrates that he has knowledge of substantive information concerning the allegations of fraud against New York and Frey, separate from what has already been disclosed concerning SCS. In reviewing Long's allegations, the Court concludes that the allegations against New York and Frey are separate and distinct from those against SCS. ·

New York next argues that even if the allegations against SCS are found to be separate from those against New York, Long's disclosures to federal authorities and to the United States Department of Education ("DOE") constitute a public, disclosure because they took place within the course of his

administrative investigation. *See United States ex rel. Fine v. Advanced Sciences, Inc.*, 99 F.3d 1000, 1004 (10th Cir.1996)(holding relator publicly disclosed when he provided information regarding contractor fraud to his to age discrimination representative); *United States ex rel. Doe v. John Doe Corp.*, 960 F.2d 318, 323 (2d Cir.1992)(holding public disclosure occurred when fraud disclosed to defendant's employees during investigation).

Long asserts that disclosure to federal authorities and to the DOE is not within the statute's meaning of "public disclosure." Specifically, Long argues that disclosure of the results of the investigation conducted by three year a *state* administrative agency to federal authorities does not fit within the meaning of the "public disclosure" provision of the FCA.

Allegations of fraud are publicly disclosed "when they are placed in the public domain." *United States ex rel. Dick v. Long Island Lighting Co.*, 912 F.2d 13, 18 (2d Cir.1990). In this case, the results of Long's administrative investigation were disclosed to federal authorities. Courts have recognized that this is sufficient to place the government on the trail of the alleged wrongdoing:

> In deciding whether the information conveyed to the court is "based upon a publicly disclosed allegation or transaction," the question is whether the information in the public domain "... could at least have alerted law enforcement authorities to the likelihood of wrongdoing ..."

*United States ex rel. Alexander v. Dyncorp, Inc.*, 924 F.Supp. 292, 299 (D.D.C.1996) (quoting *Quinn*, 14 F.3d at 654). Here, because Long alerted federal authorities, making them aware of the purported fraudulent conduct, the allegations became "publicly disclosed" within the meaning of the FCA. This leads the Court to the "original source" inquiry.

**2. Original Source Inquiry**

■ It is well established that the purpose of the 1986 amendments to the FCA was to allow a relator's claim where disclosure to federal authorities has taken place, but where the relator is an original source. *Hughes Aircraft Co. v. United States ex rel.*

*Schumer*, 520 U.S. 939, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997). Under § 3730(e)(4)(B), Long must demonstrate that he has "direct and independent knowledge" of the information on which the allegations are based, and that he "voluntarily provided [such] information" to the government prior to filing suit. *See also United States ex rel. D.J. Findley v. FPC–Boron Employees' Club*, 105 F.3d at 690 ("To qualify as an 'original source,' the relator must also have 'voluntarily provided the information to the government' before filing a *qui tam* suit which is 'based on the information.' ").

First, New York argues that Long did not have "direct" knowledge because as coordinator of the investigation, Long received his information from other people. "Direct" signifies "marked by absence of an intervening agency." *Quinn*, 14 F.3d at 656. New York further argues that Long did not have independent knowledge because it was his job to obtain this information. *Quinn* elucidates that the original source provision requires the "relator to possess direct and independent knowledge of the 'information' supporting any essential element of the underlying fraud transaction," but "does not require that the *qui tam* relator possess direct and independent knowledge of all of the vital ingredients to a fraudulent *transaction.*" *Quinn*, 14 F.3d at 657. Long more than satisfies the "direct knowledge" aspect of the FCA provision because, through his own labor, he gained first hand knowledge of defendant's fraudulent conduct. *See Cooper ex rel. United States v. Blue Cross & Blue Shield of Fla., Inc.*, 19 F.3d 562, 568 (11th Cir.1994) (per curiam)(finding "direct knowledge" when relator acquired information through three years of his own research prior to public disclosure).

Moreover, Long's knowledge of the allegations is "independent" because it is "knowledge that is not itself dependant on public disclosure to federal authorities." *See Quinn*, 14 F.3d at 656. In fact, the reverse occurred in that Long was the one to notify the federal authorities. To find that Long is barred from bringing this *qui tam* action would undermine the purpose behind the 1986 amendments: to discourage "parasitic

suits" while encouraging parties to reveal fraudulent conduct to the government.

Finally, New York argues that Long does not satisfy the "voluntarily provided" element of § 3730(e)(4)(B) because reporting such information to his employer and the federal government was his job. The Court finds this argument without merit because Long was employed by a state agency and therefore, Long had no duty to report the results of his investigation to federal authorities.

The Court concludes that Long is an "original source" of the allegations against New York and Frey within the meaning of the FCA. Thus, this Court properly invokes subject matter jurisdiction over this action under § 3730(e)(4) of the FCA because, even though there was public disclosure, Long meets the statutory requirement for an original source.

### E. Whether Long has Pled Fraud with Particularity as to Count I

A failure to plead fraud with particularity is a ground for dismissal for failure to state a claim upon which relief can be granted. Fed. R.Civ.P. 9(b); *see United States ex rel. Alexander v. Dyncorp, Inc.*, 924 F.Supp. 292, 302 (D.D.C.1996) (citing *Shushany v. Allwaste, Inc.*, 992 F.2d 517, 520 (5th Cir.1993)).

· Count I of the complaint alleges that New York and defendant Frey engaged in a conspiracy in violation of 31 U.S.C. § 3729(a)(3). In support of this allegation, Long alleges that New York officials agreed among themselves and with SCS to conceal and protect pervasive fraud in which the New York officials knew SCS was engaging, thereby allowing the fraud to continue. New York argues that Long has not pled the fraud he has alleged against them with particularity because he has not specified the material elements of the conspiracy, and because he has not "demonstrated" that the New York officials and SCS reached an agreement in order to get a false claim paid.

■ Section 3729(a)(3) of the FCA makes liable any person who "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid." Under this section, the relator must show:

(1) that defendant conspired with one or more persons to have a fraudulent claim paid by the United States,

(2) that one or more of the conspirators performed any act to have such a claim paid by the United States, and

(3) that the United States suffered damages as a result of the claim.

*United States v. Bouchey*, 860 F.Supp. 890, 893 (D.D.C.1994) (citing cases). Since the first criterion of § 3729(a)(3) involves an allegation of fraud, under Rule 9(b) of the Federal Rules of Civil Procedure, "the circumstances constituting fraud [must] . . . be stated with particularity." *See Quinn*, 14 F.3d at 655 n. 10. This requires that the Long describe the fraudulent conduct rather than merely make conclusory allegations of fraud. *See United States ex rel. Stinson v. Provident Life & Accident Ins. Co.*, 721 F.Supp. 1247, 1258 (S.D.Fla.1989) (citing *Lincoln Nat'l Bank v. Lampe*, 414 F.Supp. 1270, 1278–79 (N.D.Ill.1976)). To survive a motion to dismiss, the complaint must contain the following particulars: the time, place and content of the false misrepresentations, the fact misrepresented, what was given up or retained as a result of the fraud, and the individual who made the misrepresentation. *See Bouchey*, 860 F.Supp. at 893. However, an exception to these requirements exists when this information is exclusively within the knowledge and control of the moving party. *See Wilkins ex rel. United States v. Ohio*, 885 F.Supp. 1055, 1061 (S.D.Ohio 1995). Long is, however, only required to allege this information, not "demonstrate" it, as defendants contend. *See Blusal Meats, Inc. v. United States*, 638 F.Supp. 824, 828 (S.D.N.Y.1986).

■ To satisfy the first criterion of § 3729(a)(3), that defendant conspired to have a false claim paid, Long alleges that New York officials conspired with SCS "to conceal and to protect" the pervasive fraud of the SCS defendants in order to have the United States pay false claims. Long does not, as New York contends, however, stop here. Rather, in support of this allegation, Long alleges that the conspiracy occurred at least between October 1990 and January

1995; that it occurred in New York; that the fraud consisted of New York officials not preventing SCS from presenting what the New York officials knew were false claims for federal educational assistance consisting of recruiting and accepting ineligible students, placing students in ineligible courses and classes, falsifying attendance and other records, and withholding refunds due to students; that New York received a portion of the federal funding; and that New York officials were able to maintain and potentially advance their positions with the state as a result of the conspiracy. Finally, the complaint names a number of New York officials who were part of the alleged conspiracy, including Joseph P. Frey, who was Long's supervisor. Presuming the truth of these allegations pursuant to the Rule 12(b)(6) standard, as the Court must at this juncture, *see id.; EEOC v. St. Francis Xavier Parochial School,* 117 F.3d 621, 624 (D.C.Cir. 1997), Long has satisfied the first criterion consistent with the Rule 9(b) standard.

The second criterion of § 3729(a)(3) requires that Long show that any one of the conspirators performed an act to have a false claim paid. In his complaint, Long asserts, *inter alia,* that New York officials rejected and ignored evidence that Long had uncovered in his investigation that the SCS defendants were engaged in those fraudulent activities, and that the New York officials limited Long's investigation in order to allow the SCS officials to continue to present false claims. Thus, Long has alleged that the overt acts which the New York officials performed were, *inter alia,* allowing the alleged fraud to continue in the face of evidence uncovered by Long's investigation and limiting Long's investigation in numerous ways in order to allow the fraud to continue. Presuming the truth of these allegations pursuant to the Rule 12(b)(6) standard, Long has satisfied the second criterion consistent with the Rule 9(b) standard.

The final criterion of § 3729(a)(3) requires that the United States suffer damages as a result of the false claim. Long asserts that the United States lost $25 million per year as a result of these false claims. Presuming the truth of these allegations pursuant to the

Rule 12(b)(6) standard, Long has satisfied the third criterion consistent with the Rule 9(b) standard.

Accordingly, New York's motion to dismiss this count for failure to plead fraud with particularity with respect to Count I is therefore **DENIED.**

### F. Whether Long Has Stated a Claim under § 3729(a)(1) & (2)

 ,Count II of the complaint alleges that New York knowingly caused false and fraudulent claims based upon false records to be presented to the federal government in violation of 31 U.S.C. § 3729(a)(1) and (2), and that New York was unjustly enriched thereby. Long alleges that New York officials caused the presentation of false claims and the making and using of false records and statements to achieve the payment or approval of a false or fraudulent claim, by, in essence, failing to prevent SCS from filing false claims even after New York officials knew that SCS was engaging in presenting false claims. New York argues that Long has failed to state a claim for relief under §§ 3729(a)(1) and (a)(2) because New York had no affirmative duty to prevent false claims from being presented.

The FCA establishes the liability of any person who knowingly causes false or fraudulent claims and/or records to be presented to the federal government for payment. § 3729(a)(1) and (2); *see Bouchey,* 860 F.Supp. at 893. According to the Senate Report, this knowing standard does not require either actual knowledge of the fraud or specific intent to commit the fraud. *See* S.Rep. No. 99–345, at 7, 1986 U.S. Code Cong. & Admin. News 5266. Therefore, in order to survive a motion to dismiss for failure to state a claim, the relator must only show (1) that there was a request for payment, and (2) that it was a fraudulent request. *See id.* Since the second criterion is an allegation of fraud, it is subject to the same particularity requirements outlined above. *See* Fed.R.Civ.P. 9(b).

At issue here is what is intended under the FCA to "cause" a false claim to be presented. The FCA reaches anyone who knowingly participates in causing the federal govern-

ment to pay a false claim. *See United States ex rel. Marcus v. Hess,* 317 U.S. at 544–45; S. Rep. 99–345, at 9, 1986 U.S. Code Cong. & Admin. News 5266 ("The False Claims Act is intended to reach all fraudulent attempts to cause the Government to pay out sums of money...."). Thus, for example, the FCA reaches subcontractors who cause general contractors to present false claims. *See United States v. Bornstein,* 423 U.S. at 309. The FCA has been held to reach conduct which results in a loss to the government, even though the defendant did not "make an actual demand for the money." *United States v. McLeod,* 721 F.2d 282, 284 (9th Cir.1983) (holding that a defendant who converted and refused to return money, resulting in a financial loss to the government, was sufficient to invoke the FCA). The FCA has also been held to reach the operating policy of a defendant which caused others to present false claims to the government. *United States v. Teeven,* 862 F.Supp. 1200, 1223 (D.Del.1992) (holding that defendants, whose policy to withhold refunds due to students resulted in inflated default claims to the government, were liable under the FCA because the "[d]efendants knowingly assisted in causing the Government to pay claims which were grounded in fraud."). Thus, in broad terms, the FCA reaches all parties who "engage[] in a fraudulent course of conduct that causes the government to pay a claim for money." *United States v. Incorporated Village of Island Park,* 888 F.Supp. 419, 439 (E.D.N.Y.1995).

The question here is whether New York knowingly "caused" false claims to be presented when it allegedly did not prevent the claims from being presented. First, New York contends that Long has not alleged that New York was under a duty to revoke SCS's licenses once it became aware of the fraudulent conduct, and in support, it cites the relevant New York state code regarding the administrative procedure the NYSED was required to follow before taking disciplinary action against SCS. Second, New York argues Long has not alleged that New York had a legal obligation to the United States Government to disclose the alleged fraud being perpetrated by the SCS defendants.

The Court finds both of New York's arguments unpersuasive. First, the issue is not whether the New York defendants violated the FCA by not closing down the SCS schools once New York learned of the alleged fraud. The issue here is whether New York's alleged failure to act was a course of conduct that allowed fraudulent claims to be presented to the federal government. Long has alleged, with the requisite specificity, that New York officials allowed false claims to be presented to the federal government over a number of years, and even after it knew that false claims were being made.

Finally, New York argues that in order for it to be liable under the FCA, Long must allege with the requisite particularity that the New York defendants had the *same* knowledge as SCS regarding the falsity of each claim. This is a misreading of the FCA as applied to this situation. Here, Long must allege with the requisite specificity that New York allowed what it knew to be false claims to be presented to the United States. Long has alleged that as a result of the findings of his investigations, New York knew that SCS was presenting false claims and that it did not stop SCS from doing so. Thus, New York does not have to be in the same position as SCS. The FCA prohibits *both* presenting false claims and causing false claims to be presented. *See* 31 U.S.C. § 3729(a)(1), (2). Long has not contended that New York presented the false claims itself, rather his contention is that New York caused the false claims to be presented. At this stage of the proceedings, the Court finds that Long has alleged the fraud prohibited by § 3729(a)(1) and (2) with sufficient particularity to clear the Rule 9(b) hurdle.

Accordingly, New York's motion to dismiss Count II for failure to state a claim upon which relief can be granted is **DENIED.**

### G. Long's Unjust Enrichment Claim on Behalf of the United States

Count II also seeks to invoke the equitable powers of the Court and charges that New York was unjustly enriched by its share of the payments that the federal government made to the SCS defendants. New York argues that Long does not have standing to

pursue this common law claim because it is a claim that is personal to the United States and therefore the *qui tam* relator has not suffered an injury in fact.

■ The relator has standing to bring the FCA claim "either because of his financial stake in the outcome or because Congress statutorily assigned him part of the Government's cause of action." *United States ex rel. Mayman v. Martin Marietta Corp.*, 894 F.Supp. 218, 225 (D.Md.1995) (citing Thomas R. Lee, Comment, *The Standing of Qui Tam Relators Under the False Claims Act*, 57 U. Chi. L.Rev. 543, 555–570 (1990)). An unjust enrichment claim, however, is a common-law cause of action separate and distinct from the FCA claim. In order to bring an unjust enrichment claim, the Long must show (1) that he conferred a benefit upon the defendant; (2) that the defendant knew he was receiving this benefit; and that (3) it would be inequitable for the defendant to retain the benefit. *See Bouchey*, 860 F.Supp. at 894. Because it is the United States, and not the relator, who conferred the benefit at issue in this case (i.e. federal funding), and at whose expense it would be inequitable for the defendant to retain the benefit, Long does not have standing to bring this unjust enrichment.[7] Therefore, New York's motion to dismiss Long's unjust enrichment claim is **GRANTED.**

## H. Long's Count III Claim of Wrongful Discharge Against New York and Defendant Frey

### 1. Whether Long's Claim Against New York Is Barred by the Eleventh Amendment

Count III of Long's second amended complaint alleges that New York and Frey harassed and discharged him in violation of 31 U.S.C. § 3730(h). Section 3730(h) contains the "whistleblower" protection provisions of the FCA and provides that any employee whose employment is adversely affected as a result of actions taken to further a *qui tam* action is "entitled to all relief necessary to make the employee whole" and grants district courts jurisdiction over such actions. 31 U.S.C. § 3730(h). The question here is whether, as New York argues, the Eleventh Amendment prohibits the application of § 3730(h) to a state defendant because Congress has not unequivocally abrogated state sovereign immunity, or, as Long argues, whether § 3730(h) is an integral component of the *qui tam* provisions and therefore, that a suit against a state is not barred by the Eleventh Amendment because it is brought on behalf of the United States.

■ Sections 3730(a)–(h) contain the FCA's *qui tam* provisions. Section 3730(b) establishes the *qui tam* cause of action providing that an action for a violation of § 3729 shall be brought "for the person and for the United States Government ... in the name of the Government." § 3730(b). Section 3730(h), the final subsection in the *qui tam* section, contains the whistleblower protection provisions, which state that "[a]n *employee* may bring an action in the appropriate district court of the United States for the relief provided in this subsection." § 3730(h) (emphasis added). Thus, § 3730(h) differs from § 3730(b) in that, although § 3730(h) is part of the *qui tam* provisions, it does not provide that an action brought pursuant to this section is brought in the name of the United States. The whistleblower provision is therefore properly understood as authorizing a private right of action distinct from the *qui tam* action authorized by § 3730(b).

■ Under the Eleventh Amendment, a suit by an *individual* against a state, in federal court, proceeds only if "Congress clearly intended to abrogate the States' sovereign immunity ... [and if] the Act [in which the immunity is abrogated] was passed 'pursuant to a valid exercise of power.'" *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 58, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (quoting *Green v. Mansour*, 474 U.S. 64, 68, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985)). If Congress intends to abrogate a state's immunity, Congress' abrogation must be expressed in a "clear legislative statement" in

---

7. Since the Court has decided this issue on the grounds of standing, the Court does not reach New York's Eleventh Amendment argument.

the statute. *Blatchford v. Native Village of Noatak,* 501 U.S. 775, 786, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991); *see also Dellmuth v. Muth,* 491 U.S. 223, 227–228, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989). Under the clear statement standard, then, a statement in the legislative history of a statute, but not in the statute itself, fails to be a clear statement of congressional intent to abrogate.

Section § 3730(h) authorizes any employee to bring an action against his or her employer. At issue is whether in using the word "employer" Congress has abrogated state sovereign immunity. This section of the FCA does not define "employer." However, in the Senate Report accompanying the bill, Congress elaborated upon what it meant by "employer." The report states that, as with the whistleblower protection provisions in other federal statutes after which this provision was patterned, "the definition[] of ... 'employer' should be all inclusive ... includ[ing] public as well as private sector entities." *See* S.Rep. No. 99–345, at 35, 1986 U.S. Code Cong. & Admin. News 5266. Under the clear statement standard, however, the Court must find that Congress' intent to protect whistleblowers does not extend to whistleblowers whose employer is a state because Congress did not clearly state such intention in the statute, even if the legislative history suggests such an intention.

District courts construing § 3730(h) similarly have held that actions brought against states pursuant to this section are barred by the Eleventh Amendment because the language in § 3730(h) does not unequivocally state a congressional intent to abrogate the states' immunity to suit. *Accord United States ex rel. Moore v. University of Mich.,* 860 F.Supp. at 404–05 (dismissing relator's § 3730(h) claim against a state entity on Eleventh Amendment grounds because, even though it is part of the *qui tam* provisions, § 3730(h) creates a private cause of action and does not specifically provide that the United States be a party to the action); *see also Wilkins ex rel. United States v. Ohio,* 885 F.Supp. 1055, 1067 (S.D.Ohio 1995) (citing *Thiokol Corp. v. Department of Treasury,* 987 F.2d 376 (6th Cir.1993) (holding that Eleventh Amendment barred an action

under § 3730(h) for compensatory relief, but not for prospective injunctive relief against officials in their official capacities)).

To sidestep the Eleventh Amendment bar, Long argues that an action under § 3730(h) should be considered an action on behalf of the United States because the whistleblower provision encourages individuals to come forward with information about fraud committed against the United States. *See United States ex rel. Foulds v. Texas Tech Univ.,* 980 F.Supp. 864, 871 (N.D.Tex.1997) (allowing suit against state entity under § 3730(h) based on the conclusion that the United States would suffer the greatest harm if § 3730(h) did not protect state employees because whistleblowers would not be encouraged to come forward for fear of retaliation). While as a practical matter, Long's argument may be correct that without the protection of § 3730(h), state employees will be reluctant to come forward for fear of retaliation, under this Court's interpretation of the statute, an action under § 3730(h) is a private cause of action, and not an action on behalf of the United States. Under the clear statement rule, therefore, Congress must clearly state in the statute that it intends to extend liability under § 3730(h) to states.

While a state employee may be reluctant to come forward with information without the protection § 3730(h) provides, the financial incentives of bringing a *qui tam* action remain. Therefore, the Court cannot conclude that the purpose of the statute would be frustrated by failure to apply § 3730(h) to a state employer. The Court thus holds that an action for monetary relief under § 3730(h) may not be brought against a state because of its Eleventh Amendment immunity from suits by individuals. Because this Court finds that Congress did not abrogate state sovereign immunity in § 3730(h), New York's motion to dismiss Count III is **GRANTED.**

2. **Whether Long's Count III Claim of Wrongful Discharge Against Defendant Frey Is Barred by the Eleventh Amendment**

Although the Eleventh Amendment bars suits by an individual against a state employer under § 3730(h) for monetary re-

lief, the Eleventh Amendment does not prevent a suit under *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), against a state official, in his official capacity, where the remedy sought is prospective injunctive relief against the state official to " 'end a continuing violation of federal law.' " *Seminole,* 517 U.S. at 73 (internal citation omitted). *Seminole* instructs, however, that an *Ex Parte Young* action is not generally available "where Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right." *Seminole,* 517 U.S. at 73. In the FCA, Congress' remedial scheme consists simply of creating a cause of action for qualified whistleblowers and granting district courts jurisdiction to adjudicate those causes of action. Creating a cause of action cannot be considered a "detailed remedial scheme" and therefore, an *Ex Parte Young* action should be allowed where a state is the defendant-employer in a claim under § 3730(h).

Defendant Frey's argument for dismissal is that New York, and not Frey is Long's "employer" and therefore, that Frey cannot be liable under § 3730(h). In his official capacity, however, Frey represents New York, and as such, can be considered Long's employer under § 3730(h). The Court therefore holds that Long may maintain his claim under § 3730(h) for prospective injunctive relief against Frey. Defendant Frey's motion to dismiss Long's § 3730(h) claim in Count III therefore is **GRANTED** insofar as Long seeks monetary relief, but **DENIED** insofar as Long seeks prospective injunctive relief.

### 3. Whether Long's § 3730(h) Claim Against Defendant Frey Fails to State a Claim Upon Which Relief Can Be Granted

As this Court has held that Long's § 3730(h) claim may proceed against defendant Frey for prospective injunctive relief, the question remains whether Long has stated a claim upon which relief can be granted.

Under § 3730(h), any employee whose employment is adversely affected "because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section" is "entitled to all relief necessary to make the employee whole." § 3730(h). The statute indicates that the acts that are protected "include[] investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section." *Id.* In order to state a claim under this section, the relator must show (1) he took actions that are protected by the statute, (2) the defendants knew that he took these actions, and (3) he was fired in retaliation for those actions. *See Robertson v. Bell Helicopter Textron Inc.,* 32 F.3d 948, 951 (5th Cir.1994). Pursuant to a Rule 12(b)(6) motion, the Court need only satisfy itself that assuming that the relator's allegations are true, he has sufficiently alleged these elements.

New York[8] argues that Long has not stated a claim under § 3730(h) because it was Long's job to investigate possible false claims against the federal government, and therefore, he was not "acting for himself or others in furtherance of a FCA action," as required by the statute.

The Senate Report accompanying the enacted version of the bill instructs courts to broadly interpret which activities are protected. *See* S.Rep. No. 99–345, at 34, 1986 U.S. Code Cong. & Admin. News 5266. Long alleges that the protected actions he took in furtherance of this action were his refusal to limit his investigation as his supervisors instructed him and reporting the results of his investigation to federal authorities. Drawing all reasonable inferences in favor of Long, by not limiting his investigation, and by reporting both the results of his investigation and New York's interest in the federal funds disbursed to SCS, this Court can reasonably conclude that Long discovered fraud which was in furtherance of his *qui tam* action.

The second element under § 3730(h) the relator must show is that the defendant know

---

**8.** Both New York and Frey argue that Long fails to state a claim under § 3730(h). Although the Court holds that New York is not a proper defendant for a claim under § 3730(h), the Court considers New York's arguments as Defendant Frey's. Furthermore, in his own motion, Defendant Frey has adopted New York's arguments. *See* Frey Mem. P & A at 1.

that the relator was engaged in protected activities. *See also* S.Rep. No. 99–345, at 35, 1986 U.S. Code Cong. & Admin. News 5266 ("the whistleblower must show the employer had knowledge the employee was engaged in 'protected activity' "). Frey argues that Long has not stated a claim under § 3730(h) because Long has not alleged that his supervisors had noticed that he was pursing a FCA action against them.

In *Robertson*, the Fifth Circuit interpreted the knowledge requirement to mean that the employee must actually accuse his employer of defrauding the government. *See Robertson*, 32 F.3d at 951. The *Robertson* court made this determination in the context of an employee whose job was to substantiate costs his employer was charging the government, and so reasoned that since this was his job, merely questioning his supervisors about costs did not satisfy the statute. *See id.* at 951–52.

Other courts have not required an express accusation, but rather have analyzed whether the actions that Long allegedly took could reasonably have "put defendants on notice of a possible *qui tam* action." *United States ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1522 (10th Cir.1996). In *Ramseyer*, the court found that Long had not satisfied this requirement where the plaintiff's job was to monitor compliance with Medicaid requirements and she complained to her supervisors that the company was not complying with these requirements. *See id.* at 1522–23. The court found, however, that on the facts of that case, the "[p]laintiff gave no suggestion that she was going to report such noncompliance to government officials." *See id.* at 1523.

In another case, *Mikes v. Strauss*, 889 F.Supp. 746 (S.D.N.Y.1995), the court reasoned that "insist[ing] upon an express or even an implied threat of [a *qui tam* ] action ... is wholly unrealistic in an employment context." *Id.* at 753. In *Mikes*, the court held that the notice rule required that the employee show that the "employer [had] reason to believe that the employee was contemplating a *qui tam* action against it." *Id.* The *Mikes* court allowed a § 3730(h) action to proceed where, although the employee did

not make any specific accusations of fraud against her employer, her complaints to her supervisor "clearly impl[ied] that defendant's activities were unlawful." *Id.*

In the present case, Long alleges that he disregarded Frey's, his supervisor's, instructions to limit his investigation, that Frey knew that his instructions were being disregarded, and that, although Frey apparently eventually acquiesced, Frey resisted Long's recommendation that federal authorities be notified of the information developed in the course of the investigation. Long further alleges that federal authorities suggested that Long seize SCS documents that were in danger of being destroyed, that he reported his cooperation with the federal authorities to Frey, and that Frey objected to Long's seizure of the documents and directed him to return them to SCS. Thus, unlike the facts in *Robertson* and *Ramseyer*, Long's supervisors allegedly knew that he was cooperating with federal officials. Soon thereafter, Long was removed from supervision of the investigation, demoted, and eventually fired. Taking these factual allegations as true for the purposes of a motion to dismiss, this Court finds that the facts as alleged gave New York and Frey reason to believe that Long would pursue a FCA claim against them.

The third element under § 3730(h) requires that the employee show that he was fired in retaliation for engaging in protected activities. *See also* S.Rep. No. 99–345, at 35, 1986 U.S. Code Cong. & Admin. News 5266 ("the whistleblower must show ... the retaliation was motivated, at least in part, by the employee's engaging in protected activity"). The employee is required to establish this by a preponderance of the evidence. *See* S.Rep. No. 99–345, at 35, 1986 U.S. Code Cong. & Admin. News 5266. Once this has been satisfied, the burden then shifts to the employer "to prove affirmatively that the same decision would have been made even if the employee had not engaged in protected activity." *Id.*

In the present case, Long alleges that he was removed from his position following his assisting federal authorities to obtain, by means of a subpoena *duces tecum*, information in the files of his employer, which his employer allegedly intended to return to

SCS, and which federal authorities felt they needed for their investigation of SCS. This, together with the other allegations outlined above, taken as true for the purposes of this Rule 12(b)(6) motion together with all reasonable inferences from them, satisfy Long's burden at this stage of the proceedings of showing that he was terminated in retaliation for protected activities.

As this Court finds that Long has stated a claim upon which relief can be granted under § 3730(h), Frey's motion to dismiss this claim under Count III is **DENIED**.

## I. Whether Defendant Frey is Entitled to Summary Judgment on Long's § 1983 Claim

The Court may grant a motion for summary judgment only where there is no "genuine issue as to any material fact and viewing the evidence in the light most favorable to the nonmoving party, the movant is entitled to prevail as a matter of law." Fed.R.Civ.P. 56(c); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C.Cir.1995).

Long filed his original complaint, under seal, in September 1992. Long later filed an amended complaint on March 15, 1995, in which he named Frey as a defendant.[9] Defendant Frey argues that Long's claim against him under § 1983 is barred by the three year statute of limitations that applies to Long's claim.

■ The statute of limitations applicable to a § 1983 action is the state statute of limitations for personal injury actions, which in this case, is three years both for New York, *see Rodriguez v. Chandler*, 641 F.Supp. 1292 (S.D.N.Y.1986), and for the District of Columbia. *See Banks v. Chesapeake & Potomac Tel. Co.*, 802 F.2d 1416 (D.C.Cir. 1986); *Greenfield v. District of Columbia*, 623 F.Supp. 47 (D.D.C.1985) (citing D.C.Code § 12–301(8)). Furthermore, a civil rights claim begins to accrue when the aggrieved party knows or has reason to know of the injury which is the basis for the § 1983 action. *See Cox v. Stanton*, 529 F.2d 47, 50 (4th Cir.1975) ("Federal law holds that the

time of accrual is when plaintiff knows or has reason to know of the injury which is the basis of the action.").

■ Although it is undisputed that Long was notified of his demotion on November 22, 1991 and placed on administrative leave on January 22, 1992, Long was not terminated until April 8, 1992. Defendant Frey argues that Long had notice and his claim began to accrue at the latest, in January 1992. Long argues, however, that because his termination did not become effective until April 1992, his claim, filed March 15, 1995, is therefore timely.

On the record before this Court, it is not clear whether Long had notice prior to April 8, 1992, that he would be terminated from his position. Because the statute of limitations begins to accrue when the aggrieved party has notice of injury, the precise date on which Long received notice that he would be terminated from employment is crucial to whether this claim is barred. Based on the record before the Court at this time, the Court cannot determine the precise date on which Long had notice. Therefore, because there is a genuine issue of material fact, the Court will **DENY** defendant Frey's motion for summary judgment without prejudice to reconsideration of the motion after discovery is conducted on the issue of when Long received notice that he would be terminated.

Because the Court does not decide whether Long's § 1983 claim against Frey for prospective injunctive relief is barred by the three-year statute of limitations, the Court does not reach defendant Frey's argument for qualified immunity at this time.

## III. CONCLUSION

Accordingly, it is hereby

**ORDERED** that the State of New York's motion to dismiss as to relator Long's unjust enrichment claim is **GRANTED**; and it is further

**ORDERED** that the State of New York's motion to dismiss as to relator Long's

---

**9.** Although Long's original complaint and his amended complaint are sealed, Long does not

dispute that Frey was not named as a defendant before March 1995.

§ 3730(h) claim is **GRANTED**; and it is further

**ORDERED** that the State of New York's motion to dismiss [125–1] as to all other claims is **DENIED**; and it is further

**ORDERED** that defendant Frey's motion to dismiss as to relator Long's § 3730(h) claim for monetary relief is **GRANTED**; and it is further

**ORDERED** that defendant Frey's motion to dismiss Long's § 3730(h) claim in Count III is **GRANTED** insofar as Long seeks monetary relief, but **DENIED** insofar as Long seeks prospective injunctive relief; and it is further

**ORDERED** that defendant Frey's motion to dismiss [127–1] as to all other claims is **DENIED**; and it is further

**ORDERED** that defendant Frey's motion for summary judgment as to relator Long's § 1983 claim is **DENIED** without prejudice.